UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| United States of America ex rel.<br>RODNEY ADKINS,<br><br>Petitioner,<br><br>v.<br><br>MARCUS HARDY, Warden,<br>Stateville Correctional Center,<br><br>Defendant. | No. 11 C 5507<br>Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

This is a petition for a writ of habeas corpus by Rodney Adkins. For the following reasons, that petition is denied.

**BACKGROUND**

In 2007, a jury found Petitioner guilty of first degree murder, home invasion and residential burglary. The penalty phase was heard by the judge without a jury. After a hearing, the trial court sentenced him to death. As a condemned prisoner his appeal went directly to the Supreme Court of Illinois which affirmed his convictions in a lengthy and detailed opinion. *People v. Adkins,* 239 Ill.2d 1, 940 N.E.2d 11 (2010). His execution was scheduled for March 15, 2011. In 2011 the Governor of Illinois commuted the death sentence to a term of natural life in prison. The minimum sentence was twenty years; if the writ of habeas corpus has merit, petitioner would be entitled to seek a less than life in prison sentence from the state court. *See Simpson v. Battaglia,* 458 F.3d 585 (7th Cir. 2006).

The Supreme Court of Illinois properly established the facts of the case which stand under the provisions of 28 U.S.C. § 2254(e)(1). I set forth the opinion as it recites the facts.

1

The Crime Scene

On July 31, 2003, two burglaries and one murder were committed at 936 Washington Boulevard in Oak Park. When Frank Perino, a resident of the building, returned from work that afternoon and entered through the rear entrance, he noticed that the back door of Catherine McAvinchey's condominium unit had been forced open. He called the police and let them inside the building when they arrived. Officer Michael Kelly and two other officers entered the unit that had been broken into and found McAvinchey, face down on the floor. Firefighters who responded detected no vital signs.

The officer who processed the scene observed that the rear door to the apartment had been kicked in. The footprint on the door was upside down, with the heel at the top of the print and the toe at the bottom. On a kitchen counter just inside the door, the officer found a plastic cap shaped like a cap for a soda bottle but four or five inches around with a slot in it, as if a large bottle had been used as a bank. In the kitchen sink, he found a large knife with a bloodstain beneath it. The knife matched a set of knives stored in a wooden block on the counter. At trial, a State Police DNA analyst testified that she compared blood samples collected at the crime scene to samples from [petitioner], his girlfriend Romanette Norwood, and the victim. Blood found on the handle of the blade of the knife was consistent with the victim's.

In the living room, the officer found the victim lying face down on the floor with a large pool of blood around her head and neck. The pool of blood had begun to dry at the edges. Clear fluid found when the body was moved was later determined to be spinal fluid. A bloodstain on the back of her shirt appeared to have been made by wiping the knife blade on the shirt.

The apartment had been ransacked. Desk drawers and dresser drawers were pulled out. Two purses appeared to have been rifled through. An empty space on the desk, near a printer and power cord was the size of a computer. A large plastic bottle with a picture of a football helmet on it was lying on a chair near the desk. The bottle had no cap and it appeared to match the bottle cap found in the kitchen.

Christine Callahan was the victim's neighbor. The two women, along with Perino and a fourth resident in the building, used the same locked entrance in the rear of the building to access their units. The lock did not always work. The back door to Callahan's apartment was approximately 20 feet from the victim's back door. Callahan's

apartment was also burglarized on July 31. Several pieces of jewelry were taken, along with a large plastic bottle with a Cleveland Browns logo in which she saved coins. She identified the bottle found on the chair in the victim's apartment as the one that had been taken from her apartment. At trial, a State Police fingerprint analyst testified that she compared latent fingerprints from the crime scenes to exemplars from [petitioner], Norwood, and the victim. She found one fingerprint belonging to [petitioner] on the plastic bottle.

The same officer who processed the murder scene processed Callahan's apartment. He observed that her back door had also been kicked in and her apartment ransacked. He found a cigarette butt on the floor at the bottom of a spiral staircase that led to the upper level of Callahan's unit. He collected the cigarette butt and sent it to the crime lab for processing. The State Police DNA analyst testified at trial that the male DNA profile found on the cigarette butt would be expected to occur in approximately one in 650 billion black individuals, one in 2.1 trillion white individuals, and one in 2.5 trillion Hispanic unrelated individuals. The profile matched [petitioner's] DNA profile.

The Investigation

On September 8 and 9, 2003, Norwood was interviewed by the Oak Park police. She was wearing a Gucci watch and a pair of prescription eyeglasses, which were taken from her and inventoried as evidence. Information from this interview led police to a pawn shop and to the apartment of Fanny Roberts, [petitioner's] mother. At the pawn shop, police obtained pawn sheets dated July 31, 2003, containing [petitioner's] name. The police recovered a pair of sunglasses from Roberts' apartment.

On September 10, 2003, Norwood gave a videotaped statement to Assistant State's Attorney Jamie Santini. In this statement, she said the she had been [petitioner's] girlfriend for 13 years and that she was then living with him. She stated that around June 24 or 25, they were in Oak Park and "he had me ring somebody's bell" to see if the person was home "[s]o he could burglarize it." She walked back to the corner, where [petitioner] was waiting, and told him that no one was home. He went to the house and kicked the door in as she watched from the alley. She said that she did not enter the house. She left and did not see him again until he came to his cousin's house later with "some tapes, VCR, DVD, a couple of movies," which he said he got from the house he had burglarized.

Norwood described their activities over the next several days. On July

3

31, 2003, she slept until noon. Earlier that morning, she briefly awoke when [petitioner] left. He kissed her on her jaw and said he was leaving and would be back. He returned at about 12:30 p.m., while Norwood and [petitioner's] mother were watching television together. He was "sweating heavily" and he carried a black duffle bag. [Petitioner] pulled out two pairs of glasses from his pocket and gave them to Norwood. He took a watch from his other pocket and gave it to her. Santini showed her photographs of the glasses and the watch that she had been wearing earlier and of the sunglasses found in Roberts' apartment. She identified them as the same items [petitioner] had given her. [Petitioner] also gave a gold chain necklace to his mother. He opened the bag and "took out a black screen monitor" that was "like a computer" and put it on the bed. He also took out a laptop computer in a case and a bag full of coins. She had never seen any of these items in his possession before that date. She identified the laptop and the duffle bag from photographs she was shown by Santini.

According to Norwood, [petitioner] left for a "couple of minutes," taking the computers to the next-door neighbor's to try to sell them. He returned with the computers, which he placed in his mother's room.

Norwood and [petitioner] took a bus and a train to a pawn shop in Forest Park, where he pawned two rings for "about "$70." Then they went to a liquor store so that he could convert the "[c]oins into money." [Petitioner] purchased a "scratch out" lottery ticket and collected $500 in winnings. They bought some heroin and some "rocks" (cocaine), ate tacos, and walked to the Grand Hotel, where they checked into a room and remained for about eight hours.

The next morning, August 1, 2003, they went to Roberts' house to sleep. That evening, [petitioner's] uncle Kary came over with a friend. [Petitioner] brought out one of the computers to show the friend. Norwood turned it on for him and clicked on the "My Computer" icon. A name appeared on the screen, "[t]he lady name that was on the news, Catherine's McKen — I don't know." The television was on at the time and the victim's picture was on the screen with the name "Catherine McKenzie, something like that." She was "in a state of shock" and turned the computer off and closed it. [Petitioner] then brought out the other computer to show the friend, who ended up buying both computers in a "package deal."

Later that night, she and [petitioner] were at her mother's house when another news story about the murder came on the television. She "was hearing the whole story about the lady got slashed in the throat, something like that. And it seems to be that she stumbled up on the

4

burglar." Norwood's mother glanced at [petitioner] and asked him if he would do "something like that." He told her that he would not. A bit later, Norwood asked him again and he said "he didn't want to talk about it now," but he agreed to talk about it later at the hotel.

They purchased more drugs and went to another hotel, The Ritz. She identified the hotel from a photograph. When they were in the room, she asked [petitioner] "did he do that to that lady." He said that "he didn't know if he killed her, he said he hit her. And she fell face down because she walked in on him and saw his face." He told her "it was a mistake. She walked in on me." They took some drugs, which made him tell her "more about it because he was just saying that he hit her, he didn't do all that other stuff to her." After he started smoking crack, "he broke out crying and stuff and he admit that he killed the lady." He asked Norwood if she would tell on him and she said she would not.

August 22, 2003, was her birthday. They were at his mother's apartment. She and [petitioner] had an argument that day over the way he was treating her. She told him she wanted to break up and he "started going off." She told his mother that she was afraid of [petitioner] "[b]ecause he killed that lady. And I thought he would kill me as well."

The interview concluded with Norwood stating the she had been treated well by the police department, that no threats or promises were made to her, and that she was free from the effects of drugs or alcohol.

The victim's brother identified the watch and eyeglasses that were taken from Norwood and the sunglasses found in Roberts' apartment as his sister's. The State Police DNA analyst testified at trial that she found "a mixture" of DNA on the watch. One of the DNA profiles was female and was consistent with Norwood's. The other profile was male, but was insufficient for comparison.

The police also spoke by telephone to [petitioner's] uncle, Kary Pugh, who told police that his friend Earnest Hoskins, had the victim's computer. At trial, Hoskins testified that he and Pugh visited the residence of Pugh's sister-in-law, Fanny Roberts, on August 1, 2003. [Petitioner], who is Roberts' son, was there with his girlfriend, Romanette Norwood. [Petitioner] showed two computers to Hoskins. The computers were in a black canvas duffle bag. One was a Sony Vaio laptop and the other was a "big, black" model that he was not familiar with. Hoskins offered to buy the computers for $250, not

5

expecting [petitioner] to accept so low an offer because the computers were worth much more. [Petitioner] accepted the offer.

When contacted by the police, Hoskins explained to the police that he no longer had the computers, but that he could retrieve them. On September 12, 2003, Hoskins turned over the duffle bag containing the computers to the police. A service number on the Sony Vaio computer matched the victim's missing computer. When the police turned on the Vaio, a window appeared showing that the software was registered to the victim. At trial, Hoskins identified the duffle bag and the Sony Vaio computer and its carrying case.

[Petitioner's] Statements

On September 17, 2003, Oak Park detectives took [petitioner] from the Cook County jail to the Oak Park police station. After he was read his Miranda rights and signed a waiver, he was questioned initially by detectives William Cotter and Juan Paladines and later by Assistant State's Attorney Santini. [Petitioner] made several incriminating statements.

According to the detectives' testimony, [petitioner] said that he kicked in the back door of the victim's apartment and entered. He unlocked the front door to give himself a means of escape. He was inside, looking at a laptop computer, when he heard the front door open. He saw a woman standing there, looking at him. [Petitioner] claimed that Norwood knocked the woman to the floor and then he jumped on her upper back. He got a knife from the kitchen and began to cut her neck because he feared that she could identify him. He sawed on the back of her neck and, according to his statement, he told Norwood that because they were in this together, she had to do so as well. He stated that she did so. After he washed the knife in the sink, he continued to burglarize the apartment, taking several pairs of glasses, some jewelry, some change, and a laptop. He then went to the door of the adjacent apartment, kicked in that door, and burglarized that apartment.

The detectives then called Santini, who also interviewed [petitioner]. Paladines sat in on that interview, during which [petitioner] again admitted killing the victim and described the burglary and murder. [Petitioner] agreed to give a videotaped statement.

The tape and a transcript were admitted into evidence at trial and the tape was played for the jury. In that statement, [petitioner] said that he got up early the day of the murder so that he could "go out and

work, you know, do a sting, you know, do a little hustle." Asked to explain what he meant, [petitioner] said, "We'll go out from time to time and burglarize." He said that "about 70 percent of the time," he and Norwood would commit burglary together. She would go to the door of the home or apartment while he walked to the corner. She would ring the bell to make sure no one was at home. [Petitioner] also explained that he like to start early in the day, so "you can see people going to work, you know, you can see them leave the house." They did not normally wear gloves, but would put circles of tape on the tips of their fingers to avoid leaving fingerprints. He claimed that he and Norwood were wearing tape on their fingers the day of the killing.

When he got to the back doors at 936 Washington Boulevard, he could hear Norwood "still ringing the bell," so he knew there was no one at home. He then "donkey kicked" one of the doors, with his back to the door so that his heel was higher than his toes. The door gave way on the second kick. He went through the front door of the apartment and down the stairs to let Norwood inside. Once back in the apartment, he left the front door unlocked as a means of quick escape if it became necessary.

He went directly to the bedroom, because "that's where the jewelry was at." [Petitioner] stated the he ransacked the bedroom, taking a Gucci watch and stashing several pairs of eyeglasses in a duffle bag he found there. Santini showed [petitioner] a photograph of the black bag recovered from Hoskins and [petitioner] identified it as the same bag. In the living room, he found two wallets. He took $185 in cash from one and several credit cards from the other. Santini showed him photographs of two wallets found in the victim's apartment and he acknowledged that he had opened them and taken cash and credit cards.

[Petitioner] said that he then noticed a table with a computer on it and, on the floor next to the table, a laptop in a computer case. He identified a photograph of the table and pointed out where the laptop had been sitting on the floor. He said that he "got down on a knee to unzip" the computer case and was "closing it and zipping it up" when the victim returned through the front door. She was "about five feet away from him and was looking directly at him. [Petitioner] said that they "stared at each other for almost — it couldn't have been no more than three or four seconds but it seemed like an eternity."

According to [petitioner], Norwood hit the victim from behind and knocked her to the floor. She fell "face first. And that gave me enough time to react." Because he knew that the victim would be able to

7

identify him, he jumped on her several times, slamming his knee on the back of her neck between her shoulder blades. He believed that she was unconscious, but knew that she was still alive. [Petitioner] said that he told Norwood, "she done already recognized me, so you know what we got to do."

[Petitioner] went into the kitchen and grabbed a knife from a knife holder. Santini showed him a photograph of the knife holder, which he recognized. He explained that he slashed, stabbed, and sawed at the victim's throat. Detective Paladines bent over the table, face down, so that [petitioner] could demonstrate how he used knife on the victim.

[Petitioner] stated that while the victim was coming out of her initial unconsciousness, she was making a "gargling" sound. He claimed that at this point, he told Norwood that they were "in this together" and that Norwood had to prove her "solidarity." According to him, Norwood put her hand on the knife handle and "did like a little sawing motion." [Petitioner] wiped the knife on the back of the victim's shirt, then took it back to the kitchen where he rinsed it off, wiped it off to erase any palm prints, and left it in the kitchen sink. Santini showed him a photograph of the knife as it was found in the kitchen sink. [Petitioner] said, "That's the knife . . . in the sink where I left it."

[Petitioner] stated that he then collected the duffle bag, some CD's, some DVD's, and the laptop and went out the back door, where he kicked in the door to another apartment and burglarized it. He took a computer and some rings. He found a large glass jar filled with change, which was too heavy to carry. He could not explain how the Cleveland Browns bottle got from Callahan's apartment to the victim's apartment. He thought that "maybe Romanette brought it."

[Petitioner] and Norwood went "straight out the front door." He stated that neither he nor Norwood had any blood on them. He carried the black duffle bag and she was carrying another bag. They returned to the apartment they shared with his mother to drop off some of the stolen property.

He had not told Norwood about the nearly $200 in cash that he had taken and he did not want her to know. Later that day, they sold two stolen rings at a pawn shop for $50 or $60 and he gave Norwood some of the money.

At a nearby liquor store, he exchanged the stolen coins for about $55 in bills and purchased some liquor and a scratch-off lottery ticket. The ticket was a winner and he collected another $500 in cash. He and

8

Norwood bought "a couple blows and then we got some rocks and some weed," referring to heroin, cocaine, and marijuana. They spend several hours in a motel, "had sex, got high," before returning to his mother's apartment.

[Petitioner] tried, unsuccessfully, to sell the computers to a neighbor. A day or two later, his uncle came over to have [petitioner] cut his hair. The uncle brought a friend with him. [Petitioner] identified a photograph of Hoskins, whom he knew as "Bishop," as that friend. His uncle was not interested in the computers, so [petitioner] offered the Sony Vaio to Hoskins for $500. Initially Hoskins was not interested, but then he offered [petitioner] $300, which [petitioner] accepted. He and Norwood took the money and "left again after that and checked into another motel."

At the conclusion of the taped interview, [petitioner] was asked how he had been treated while at the Oak Park police station. He replied, "I been treated just." He acknowledged that he had been given food and something to drink and that he was given cigarettes to smoke. Overall, he said, "I been treated justice. It was almost like a big burden, you know, being lifted from my soul."

Trial

With the exception of Norwood's videotaped statement, which was admitted only at the sentencing phase, all of the facts summarized above came into evidence at trial.

In addition, a deputy medical examiner testified that the victim had been stabbed under the chin and on the right side of her neck. This wound severed her carotid artery. She also had a gaping incision wound on the back of her neck, consistent with a sawing motion, which was so deep that it fractured two cervical vertebrae. Another cervical vertebra, two thoracic vertebrae, and 13 ribs were also fractured. The knife from the sink could have caused the wounds to her neck. The victim also had dozens of injuries to her face, including a laceration and bruise on her upper right eyelid, petechial hemorrhages of her right eye, and abrasions on her right cheek. Her lips were lacerated in several places and she had abrasions on the bridge of her nose. She also had several hemorrhages to her brain, consistent with blunt force trauma. The fractures were consistent with a man of [petitioner's] size jumping on the victim's spine. These injuries would have rendered the victim paraplegic from the chest down. Other lacerations, bruises, and abrasions were consistent with an assault. A stab wound on the victim's hand was consistent with her trying to ward off the attack. In

9

the medical examiner's opinion, the cause of death was multiple injuries from the assault; the manner of death was homicide.

After the State rested its case, the defense rested without presenting evidence. Closing arguments were made and jury instructions were given. The jury found [petitioner] guilty beyond a reasonable doubt of first degree murder, home invasion, and residential burglary.

On appeal the petitioner alleged trial errors:

1. Judicial error in dismissing a juror who had not disclosed that she had been arrested for a misdemeanor battery sixteen years before trial. The dismissal was made without asking the juror whether she had just forgotten the incident.

2. Other crime evidence was improperly admitted.

3. The home invasion conviction should have been vacated since the same physical act was the basis of both the entry into the home and the murder so that use of the home invasion as an aggravating offense was improper.

4. Defense counsel was ineffective for conceding in the guilt phase that petitioner had committed residential burglary which itself is a capital eligibility factor.

5. Confrontation was denied in the penalty phase in which the judge heard as evidence the video recording of his girlfriend implicating him and considered an affidavit from a state official describing petitioner's crimes in Arkansas.

6. The death sentence was excessive because he would have endangered no one if he were simply imprisoned.

## DISCUSSION

The petition for the writ in this court consists largely of the argument section of the brief filed by his appellate counsel in the Supreme Court of Illinois. Exhaustion of state remedies is conceded.[1] No statute of limitations or non-retroactivity defenses are offered.

A significant percentage of the stated grounds for issuing the writ are not available grounds in habeas corpus cases. This is so because only violations of the federal constitution and federal law can be cause for issuance of the writ. *Estelle v. McGuire,* 502 U.S. 62, 68

---

[1] Petitioner sought rehearing in the Supreme Court of Illinois which was denied in November of 2010. In April of 2011 the Supreme Court of the United States denied certiorari.

(1991); *Wilson v. Corcoran,* 131 S.Ct. 13, 16 (2010). This is old, established law. It is further clear that even federal claims cannot serve as the basis for the federal writ if the claims had not been presented to the state courts as *federal* claims. *See Baldwin v. Reese,* 541 U.S. 27, 30-31 (2004).

In this case it is clear that the failure of the judge to ask a juror whether she had simply forgotten a prior arrest was attacked as a failure to follow state law. The state supreme court found the actions of the trial judge in excusing the juror to be reasonable. Indeed the court noted that unlike the precedents cited by petitioner which involved jurors who were potentially biased against a defendant because they had been crime victims, this case involved a jury who, like petitioner, had been arrested for crime. The state supreme court, in fact, did exactly what a federal reviewing court would do, it deferred to the trial judge's superior ability to judge credibility and demeanor of a prospective juror.

The challenge to admission of other crimes evidence was also challenged on grounds of state law. No federal precedent was cited on appeal and the state supreme court concluded that the prior crimes were relevant for a purpose other than showing mere propensity. Indeed, the state court noted that in the context of the defense which was based on the premise that petitioner was a burglar but not a murderer, there was no unfair prejudice to defendant in this case by virtue of the jury hearing petitioner describe to police his prior thefts. As the state court very reasonably noted, "[i]f anything, his explanation of his efforts to ensure that he would not encounter anyone at home during one of his crimes is consistent with his claim that he is merely a burglar, not a murderer. Thus, even if it was error to admit portions of defendant's statement, he is not entitled to a new trial on that basis." State evidence law claims are generally not cognizable in habeas cases. *Dressler v. McCaughtrey,* 238 F. 3d 908, 921 (7th Cir. 2001). In any

11

event, the Supreme Court has yet to decide or hold that "prior crimes" evidence even if it is to show criminal propensity is a violation of due process. See *Lockhart v. Chandler,* 446 F.3d 721, 724 (7th Cir. 2006).

Illinois does have a rule that one act cannot be two crimes. This is not a federal constitutional rule as the Supreme Court of Illinois opined in *People v. Henry,* 204 Ill.2d 267, 789 N.E.2d 274 (2003). As a practical matter, Illinois would not, and did not, apply the one act, one crime rule because the offenses of home invasion and intentional murder are not based on the same physical acts nor, for that matter, is residential burglary based on the same physical acts. Either residential burglary or home invasion alone was enough to establish eligibility for the death penalty. In any event, federal law does not impose the one act rule on the states.

Arguably, petitioner claims that federal precedent may forbid states from imposing a death penalty solely because a defendant kills someone. This appears to be an argument that the state court did not resolve so I review it without deference. *Zant v. Stephens,* 462 U.S. 862, 877 (1983), discussed the need to have capital eligibility factors that would narrow the class of persons eligible for the death penalty. Petitioner notes that the home invasion charge did allege that he "beat and stabbed" the victim. This, he argues, meant that murder and home invasion (though not residential burglary) were premised on the same physical acts. But this cannot be so because the physical act in home invasion was entering the victim's home. By confining the death penalty to persons who do not simply kill the victim but do so by invading their home, this narrows the kinds of cases in which a murderer can be sentenced to death. On this putative federal claim, I deny it on the merits.

Petitioner did argue that, under state law, the death sentence was excessive. This is not a claim that can be reconsidered here. The procedural requisites for imposition of a death sentence

were met and this was not challenged. What was argued is that state law does not permit the death sentence upon one who had a troubled life and whose dangerousness would be effectively constrained because he would be in prison. There is no federal constitutional rule which prohibits the imposition of the death penalty on a person with a very difficult life whose life will be spent in prison if he is not executed.

There remain two claims which petitioner put forward in state court on grounds that are clearly based on federal constitutional rights. I address them in turn. In order for petitioner to prevail it must be shown that the state court ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1) or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). In short, it is more difficult to succeed in winning a habeas corpus case than it was to appeal to the state courts as petitioner has already done without success.

The effectiveness of his several trial counsels is challenged. During the guilt phase, defense counsel conceded that petitioner had committed a residential burglary. The ineffectiveness of counsel claim was not made in federal constitutional terms. *Strickland v. Washington,* 466 U.S. 668 (1984), requires that a petitioner show that defense counsel's conduct falls outside the wide range of reasonable professional assistance and show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. On appeal petitioner simply asserts that prejudice from the acts of counsel had to be presumed. This is so, it is argued, because by conceding the residential burglary petitioner was precluded from challenging one of the two possible offenses that would make petitioner eligible for capital punishment.

13

The claim fails for two reasons. First, defense counsels' action did not fall outside the wide range of reasonable professional assistance. On the evidence here the only feasible defense was to concede the burglary because the evidence was overwhelming and thus lay the foundation for arguing the absence of similar evidence with respect to identity of the perpetrator. Petitioner does not offer an example of an alternative defense strategy. An attempt to deny the strength of the burglary evidence would make the defense appear to be dishonest.

Petitioner does not suggest any alternative defense. Indeed, on the guilt phase, the petitioner has not and does not challenge the adequacy of his defense.

In any event, the petitioner is not entitled to the writ because the Supreme Court of Illinois made a reasonable determination that counsel was not ineffective and petitioner was not prejudiced. The defense did not fail "to subject the prosecution's case to meaningful adversarial testing [which would render] the adversarial process presumptively unreliable." *See United States v. Cronic*, 466 U.S. 648, 659 (1984).

The state court said this:

> At the guilt phase of the trial, the attorney presenting [petitioner's] opening arguments began: "On July 31st, 2003, [petitioner] committed a burglary at the home of Catherine McAvinchey." She further stated that after defendant rummaged through her apartment, taking jewelry and other items, "then what he did was left." She acknowleged that the physical evidence, including fingerprints and DNA, placed him at the scene of the murder, but argued that no physical evidence, such as hair or fibers, connected him to the murder weapon or to the body of the victim. She concluded by saying that "the physical evidence in this case will show you that [petitioner] committed a burglary, but this evidence does not show that he committed murder."
>
> Defense counsel thoroughly cross-examined the State's witnesses. The proprietor of the pawn shop where [petitioner] sold jewelry the afternoon of the murder acknowledged that he saw no blood on [petitioner's] clothing. [Earnest] Hoskins did not find any blood on the duffle bag or the computers he bought from [petitioner]. The officer who recovered the duffle bag from Hoskins saw no blood on the bag or

14

its contents. The assistant medical examiner acknowledged on cross examination that DNA or other evidence may be transferred from an attacker to a victim "in close proximity" to each other and that no such evidence was found on the victim's body.

Other cross-examinations established that the State Police DNA analyst did not swab or test the handle of the murder weapon when she tested the bloodstain on the blade. She did not test fingernail clippings from the victim for DNA or examine the black duffle bag for bloodstains. She agreed that she could not determine when a particular DNA sample was deposited.

Defense counsel questioned [Detective] Palandines regarding photographs of [petitioner] taken after he gave the videotaped statement. The photographs were taken to show that he had no injuries. Paladines acknowledged that such photographs would not show if any "mental coercion or anything like that" had happened to [petitioner].

Counsel also questioned both [Detective] Cotter and Paladines regarding the fact that Norwood was not charged in this case, suggesting that they believed [petitioner']s confession was false, at least to the extent that it implicated Norwood in the burglary and murder. Assistant State's Attorney Santini also acknowledged that the only person charged with this murder was [petitioner]. However, the trial court sustained the State's objections to all other questions regarding his decision not to charge Norwood and his belief or nonbelief in the truth of [petitioner's] statement.

The defense rested without calling any witnesses.

In closing argument, defense counsel told the jury that "a deliberate and dispassionate examination of the evidence" would show that "[petitioner] committed the residential burglary of Cathy McAvinchey's home, but he did not see her, he did not come into contact with her, and he did not murder her." Counsel repeatedly emphasized the fact that no physical evidence connected [petitioner] to the murder weapon or to the victim's body — there was no evidence of him on her, no evidence of her blood on him. Counsel described his client as a drug addict who stole to support his habit, but who was not a murderer, and called the jury's attention to unidentified fingerprints in the victim's home,
pointing out that the police did not attempt to lift fingerprints from the sink or faucet handles to see who else might have rinsed blood from the knife.

15

Counsel argued further that [petitioner's] video-taped statement was false, emphasizing the fact that [petitioner's] statement implicated Norwood, yet she was not charged. If his statement were true, counsel argued, Norwood would have been charged. Thus, the "reasonable inference is that Oak Park and the State's Attorney do not believe that Romanette Norwood was there when the murder happened." The court sustained the State's objection to this comment.

Counsel characterized the portions of the statements concerning the burglary as true and noted their detail. In contrast, counsel argued, the portions of the statement regarding the alleged murder were lacking in detail or were inaccurate (for example, [petitioner] said that there was little blood at the scene). This, he suggested, indicated that the police "fed" [petitioner] details of the murder so that he would include them in his statement. According to counsel, it was noteworthy that [petitioner's] statement did not mention his smoking a cigarette at the scene. This omission, he suggested, occurred because the police did not learn until much later that the cigarette butt found in [victim's neighbor] Callahan's apartment contained [petitioner's] DNA.

In conclusion, counsel reiterated the theme of the defense: "If he left behind evidence of a residential burglary, why wouldn't he leave behind evidence of a murder?" Counsel reminded the jury of the presumption of innocence and the State's burden of proving guilt beyond a reasonable doubt.
Defendant's attorneys did not concede that he was guilty of murder; they did subject the State's case to meaningful adversarial testing; and they did present a theory of the defense.

The evidence convincingly demonstrated that [petitioner] committed the burglary of McAvinchey's apartment. Defense counsel recognized that there were only three possible explanations for what happened on that July day: either [petitioner] broke into an apartment in which the resident had just been murdered, or he committed the murder in the course of a burglary, or he left the apartment with stolen property and the resident was murdered by someone else almost immediately thereafter. Counsel likely found that first scenario unworthy of belief because a person who discovered a murder scene during a burglary would likely flee rather than remain to complete the crime and leave behind evidence that could incriminate him in the murder. Thus, the theory pursued by the defense was that the mere possibility of the third scenario created reasonable doubt of [petitioner's] guilt.

Counsel also had to contend with [petitioner's] videotaped statement,

> which admitted both the burglaries and the murder. Attempts to exclude the statement were unsuccessful. Thus, the attorneys representing [petitioner] recognized that to avoid a conviction for murder, they had to not only explain the physical evidence, they had to discount [petitioner's] incriminating statement. The only reasonable way to address the physical evidence — DNA on the cigarette butt, fingerprint on the bottle, and the stolen goods either pawned, sold, or given away by [petitioner] — was to admit that he had committed the burglaries. Counsel also argued zealously, but unsuccessfully, that [petitioner's] statement was not worthy of belief because he was either lured or pressed into making the statement.
>
> [Petitioner] does not suggest an alternative theory that might have been pursued at trial and, indeed, he admits that this theory was a reasonable approach at the guilt phase, given the evidence against him.

There is an argument that by conceding the residential burglary, defense counsel was giving away his right to insist that capital eligibility elements had to be proved beyond a reasonable doubt. *See Ring v. Arizona*, 536 U.S. 584, 588 (2002). But this is not so. At the sentencing phase the prosecution moved for admission of all the trial evidence which the court granted. The state trial court had what the reviewing court characterized as "overwhelming evidence that he [petitioner] was interrupted by the victim while in the act of burglarizing her apartment and that he killed her to avoid being identified." In short the eligibility factors were proved beyond a reasonable doubt. There was, in fact, no reasonable probability that, absent the concession that petitioner did commit residential burglary, either judge or jury would conclude that his perpetration of that crime was not proved beyond a reasonable doubt. The evidence on that offense was indisputable. The concession was made as a gesture to communicate to the jury that the defense is credible because the petitioner was willing to concede his guilt when he was the perpetrator. In fact, what the defense did was concede what was an airtight case of burglary. No harm was done to petitioner by so doing. The jury itself would not have to decide whether the eligibility factor was proved because petitioner waived a jury trial on sentencing and did so

before the jury was selected.

In any event, even if it is assumed that defense counsels' decisions effectively foreclosed an attack on capital eligibility based on prior convictions, the acts of counsel were well within the realm of effective representation tactics. The notion that giving up on penalty to try to win on guilt is a presumptively ineffective representation is the foundation of the attack on defense counsel. The notion is not now, and has never been, consistent with law.

In *Florida v. Nixon,* 543 U.S. 175 (2004), a unanimous Court (the Chief Justice not sitting) rejected a charge of ineffective assistance of counsel based on the fact that defense counsel acknowledged Nixon's guilt of a kidnapping and murder. The prosecution rejected plea bargains to avoid the death penalty and defense counsel concluded that his best course would be to concede guilt "thereby preserving credibility for penalty-phase evidence of Nixon's mental instability and for defense pleas to spare Nixon's life." The Court cited other instances in which defense counsel conceded guilt and fought over penalty.

In the instant case, defense counsel chose to concede a necessary element for death penalty eligibility to improve petitioner's chances of avoiding a murder conviction. Despite defense counsel's concession, the prosecution still had to prove the existence of the element before the trial judge at the penalty phase. Even in the penalty phase defense counsel did not concede that the sentence should be the death penalty. Defense counsel challenged the prosecution's proof of petitioner's age at the time of the offense and argued that it was not proven that petitioner rather than his girlfriend actually killed the victim. A review of the record shows that defense counsel's strategy was a professionally competent choice, perhaps the only professionally competent choice. Neither petitioner nor his appellate counsel has proposed an

alternative.[2]

The final objection to the state court process was the use of hearsay in the penalty phase hearing. There was a videotaped statement from petitioner's girlfriend Romanette Norwood describing petitioner's actions around the time of the murder and there was an affidavit from an Arkansas State Police official describing petitioner's history of burglaries and arson in that state. The state court found that no Supreme Court precedent required application of the confrontation clause to capital sentencing hearings or, for that matter, to sentencing hearings in general.

There is Circuit conflict over whether *Crawford v. Washington,* 541 U.S. 36 (2004), which broadened the scope of constitutionally required confrontation at trial, would require confrontation at a penalty phase of a capital case. The state court noted this and concluded that the Supreme Court has never clearly established the application of confrontation rights to the penalty phase. Petitioner has conceded this point. *See Evanstad v. Carlson,* 470 F.3rd 777, 783 (8th Cir. 2006) ("When the federal circuits disagree as to a point of law, the law cannot be considered clearly established). The petitioner asserts that the confrontation right was clearly established in *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011). Even if that is so, it does not help petitioner because the rule was not established when the state court ruled or when its judgment became final. In the absence of a clearly established rule a state court decision cannot have been contrary to Supreme Court precedent. In any event, *Bullcoming* does not expand the confrontation requirement to penalty phase procedures. It could not have done so because the hearsay offered there was offered to prove guilt, not to establish aggravation and mitigation in a sentence proceeding.

---

[2] At the sentencing phase the crime of home invasion was proved without the necessity of a concession. The evidence before the court proved residential burglary whether or not defense counsel conceded guilt. Guilt of residential burglary satisfied the requirement that the death penalty cannot be invoked without proof of some offense other than that of killing another human being.

I deny a certificate of appealability. In cases attacking competency of counsel, particularly in death penalty cases, I am inclined to grant a certificate of appealability but I decline to do so here. I read the record in this case and I saw no better approach to the defense other than the one taken by defense counsel in this case. It would have been permissible for defense counsel to have challenged the residential burglary charge but it would be extremely unlikely to succeed either at the guilt or the penalty phase. Considering the wide berth we give to judgments of counsel I would not consider *that* choice to have been ineffective assistance of counsel. But the clearly better choice was the one defense counsel made here. If that wide berth can be deemed to have a center, the tactical decision here was, by far, the closest one to that center.

## CONCLUSION

The petition for a writ of habeas corpus is denied. A certificate of appealability is denied.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: January 30, 2013